**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00172-CV**
_____

**IN THE INTEREST OF T.B., K.B., J.H., AND J.H.**

**On Appeal from the 317th District Court**
**Jefferson County, Texas**
**Trial Cause No. F-235,935**

**MEMORANDUM OPINION**

After a bench trial, Appellants appeal the Order of Termination terminating their parental rights to their minor children. The trial court terminated father J.H.'s ("Josh") rights to his daughters Jane and Jen and mother T.B.'s ("Trish") rights to her son Tim and daughters Kim, Jane, and Jen.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (2). The Order of Termination also terminated the parental

---

[1] To protect the identity of the minors, we use the pseudonyms to refer to the children, parents, and family members, *See* Tex. R. App. P. 9.8(b)(2).

1

rights of father C.H. to his son Tim and the rights of father S.L. to his daughter Kim.[2] We affirm the trial court's judgment terminating the parent-child relationships.

## Background

On September 13, 2019, the Department of Family and Protective Services ("Department") filed an Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship. Three children—Tim (10 years old), Jane (3 years old), and Jen (8 days old)—were named as the subjects of the suit. The petition named Trish as the children's mother and Josh and C.H. as fathers.

The petition was supported by an affidavit by a Child Protective Services (CPS) worker and representative of the Department. According to the affidavit, on September 11, 2019, the Department received an intake regarding neglectful supervision of Tim, Jane, and Jen and also alleged that there was currently an open foster care case for a fourth child, Kim (9 years old). The CPS worker alleged that on September 12, 2019, he spoke with Tim at his elementary school and found it odd that Tim was wearing a jacket because the temperature outside was over ninety degrees. Although Tim told the CPS worker that "he gets cold easily[,]" when Tim took off his jacket and raised his shirt, Tim became sad and the CPS worker observed

---

[2] Fathers C.H. and S.L. are not parties to this appeal, and we include limited details about them only as necessary to explain the facts. S.L. filed an affidavit voluntarily relinquishing his parental rights to Kim.

2

round circular scars on Tim's back and upper chest that appeared to be burn marks caused by cigarettes. Tim stated that the marks were "from discipline," but he did not say who made the marks. Tim later told the CPS worker that the marks were from mosquito bites and from the dog scratching him. The CPS worker went to the family home to interview Trish, who said the marks on Tim were old and were caused by a dog scratching him. Trish also reported that C.H. was Tim's father, but he was not involved in Tim's life and that Josh, who was Jane's and Jen's father, had lived in the family home for the past three years.

The affidavit further stated that Trish's daughter Kim was previously removed from the home, Kim had unexplained injuries to her upper arm, Kim was diagnosed with failure to thrive, and Kim was still in the Department's care where she had gone from twenty-nine pounds in May 2019 to forty-three pounds in September 2019. The affidavit also stated that Jane had received a broken arm at age five months from an unexplained injury and there were several reports on this family to the Department for unexplained injuries. At a pretrial hearing, the matter concerning Kim was consolidated with the case concerning the other children.

Evidence at Trial

Testimony of Priscilla Lewis

Priscilla Lewis testified that she was the CPS caseworker involved in the report of neglectful supervision of Kim in May 2019, which included an allegation

3

of possible abuse by an unknown perpetrator. Lewis agreed she had also been involved in later investigations that involved Kim and Tim. According to Lewis, Kim has cerebral palsy and microcephaly, is unable to communicate, is wheelchair-bound, cannot move without assistance, has numerous delays, and has a G-tube for feeding. Lewis agreed that she received multiple reports about Kim. Lewis testified that she observed marks or bruises on Kim's arms, including old and new scratches and old scars. According to Lewis, Trish had stated that Kim may have scratched herself, and although Kim's nails were not trimmed, Kim was unable to scratch herself. Lewis testified that CPS did not receive information from Trish about how Kim received bruises, and the CPS forensic team had stated there were "possible friction marks" on Kim's arm, but Kim was unable to move around by herself. Lewis did not think the bruises on Kim were bedsores because the bruises were on Kim's elbows. Lewis also testified that University of Texas Medical Branch contacted her in May 2019 regarding Kim's diagnosis of failure to thrive, Kim only weighed twenty-nine pounds at the time, and Kim had also been diagnosed with failure to thrive in February 2019 when Kim had drainage from her ear and an injury on her spine. Lewis agreed there were concerns that Trish was not honest about the care and feeding Kim was getting, and CPS had received complaints from the school that they had to bathe Kim because she was dirty. According to Lewis, this was a concern because Kim was unable to wash herself, she needs others to make sure her needs

4

are met, and she has a G-tube that needs to be cleaned. Lewis testified that after multiple referrals to CPS, the decision was made to remove Kim and see if Kim could gain weight in a controlled environment. Lewis believed that the weight loss Kim was experiencing at home was life-threatening and was a significant factor in removal because Kim is entirely dependent on others. Lewis agreed that Kim was in immediate danger at the time of the removal due to her failure to thrive diagnosis that had been ongoing for years.

Lewis testified that Trish and Josh were living together at the time and that Josh helped care for all the children. Lewis testified that she only observed Trish with Kim during visits, and that Trish and the children played and interacted with Kim, but "[o]ther than that[,] [Lewis] didn't see much interaction." Lewis also testified that she had concerns that Tim was a "parental child" and he was doing most of the caregiving of Kim even though he was only ten years old. According to Lewis, CPS had received about eleven referrals on this family since May 2009, including allegations that Trish was not supervising Jane, that Tim was babysitting at age seven, there were blisters and bruising to Kim's face, pressure sores on Kim, and Kim was underweight. Lewis agreed that the family had been referred for family-based safety services in 2017 and Alternative Response was involved in 2018.

Testimony of Walter Brister

Walter Brister testified that he is the CPS investigator who investigated the case involving an allegation of neglectful supervision by Trish of her children Tim, Jane, and Jen in September 2019. Brister agreed that there was an initial report when Jen was born, there was a risk factor because Trish had tested positive for marijuana early in the pregnancy, and one of Trish's children had already been removed.

Brister testified that when he went to Tim's school, he observed Tim wearing a jacket, Brister found that concerning because it was ninety degrees outside, and Brister thought Tim might be hiding something. Brister testified that Tim was hesitant to take off his jacket, but after Brister told Tim he was there to help if someone was hurting him, Tim removed his jacket and lifted his shirt. Brister observed about seven or eight "circular marks that appeared to be cigarette burns or cigar burns[]" on Tim's back and five marks on his chest that Brister thought were old injury marks because they showed scarring and scabbing. Brister asked Tim how he got the marks, and Tim said they were "from discipline[,]" but Tim did not say who disciplined him or how. Brister testified that when he spoke with Trish, she said the marks on Tim came from dog scratches or mosquito bites. According to Brister, by the time he returned to the school to talk with Tim, Trish had called the school and spoken with Tim, Tim knew an interview at Garth House was set up, and Tim then told Brister the marks came from dog scratches or mosquito bites. Brister

6

testified "[t]here's no way that they could have been caused by dog scratches due to the fact that these were just round circular marks and no scratch marks coming off of them at all." Brister also testified that he compared the marks to photos of Kim in Lewis's case, and the circular marks on Kim were consistent with the circular marks on Tim. According to Brister, when he removed Tim and took him to foster care, Tim "begged and pleaded" not to go back home, but he did not say why, and he asked his foster parents if they would adopt him. Brister testified that Tim did not say how he received the injuries or marks in his interview at Garth House and Tim appeared afraid to speak and say how he got the injuries. Brister understood that, in his interview at Garth House, Tim stated his biological father caused some of his injuries by whipping him with a switch, but Tim had not had contact with his biological father for years, and Brister thought the injuries looked like cigarette or cigar burns because they were "pushed in with a white circular mark[.]" Brister believed that Tim was being harmed by someone in his home or by someone else known to persons in his home and there was "no way" Tim's injuries could have gone unnoticed. Brister also recalled that Jane had a broken arm from an unexplained injury when she was about five months old.

According to Brister, Tim regarded Josh as his stepfather or father figure, and Brister's investigation determined that Josh took responsibility to taking care of the children. Brister did not interview Josh. Brister testified that there had been several

7

CPS investigations of unexplained injuries to the children that occurred while Josh was living in the home, that the investigations could not determine the cause of the injuries, but that the parents "should know at least who caused the injuries." Brister further testified that "there [are] injuries on two children that [Josh] does not have any relation to, but there's no injuries on the children he does have relation to." Brister agreed that it had not been determined who caused the marks on Tim. Brister also testified that Trish had stated that Tim's biological father C.H. had not seen Tim for more than a year and C.H. had not been involved with Tim.

Testimony of Stephanie McGlory

Stephanie McGlory testified that she was the CPS caseworker for the case involving Kim, Tim, Jane, and Jen. McGlory agreed that C.H. was Tim's biological father, C.H. was served in this lawsuit and knew Tim had been in foster care, C.H. was not working his service plan and had not seen Tim during the lawsuit, and she had not been able to contact C.H.

McGlory testified that Trish and Josh completed their service plans, but they had not taken responsibility for making the changes required to get the children back. McGlory agreed that Trish made excuses and blamed other people for the problems with the children. McGlory also testified that Josh left the area for two to three months when he was supposed to be working on his service plan. According to McGlory, Josh had named his mother as a possible placement, but then he went to

8

live with his mother, and McGlory agreed the children could not be placed in a home with "an alleged perpetrator[,]" and there were three adults and two children living in the mother's home.

McGlory believed that Kim had been neglected in her home prior to removal, and Kim was dirty and had an untreated infection at the site of her G-tube. While in foster care Kim had remained clean, gained weight, and thrived. McGlory agreed that Trish and Josh indicated they were responsible for caring for Kim. McGlory testified that Trish "[n]ever took responsibility[]" for the children's welfare. McGlory testified that one time Josh contacted her and reported that Trish "tried to run [him] over[,]" that he was in a ditch, and Trish had driven away, and that kind of home situation presents a danger to children. McGlory was concerned about Tim, who was ten years old, being Kim's caregiver because there was a time when Tim discovered ants on Kim when she was in bed, Tim moved Kim away from the ants, but he put himself where Kim had been. McGlory agreed that Tim did not want to go home and wanted to stay in his foster home. According to McGlory, Tim had asked the foster parents not to close the door and to put extra coverings on the windows because he did not want his parents to find him. Tim was observed hoarding food in his backpack, and he had fears about water that seemed to be related to someone trying to drown him in the bathtub. At one point, Tim also told McGlory that he did not want to get anyone in trouble. Tim also told McGlory that he wanted

9

to see his mother. McGlory agreed that the psychological information on Trish and Josh suggested they needed to make changes before the children could be returned to them, but McGlory did not believe they had made the necessary changes.

McGlory agreed that she had concerns about Josh caring for the children and that, under the Department's standard, if one child in the house is being abused or neglected, the parents in the home are a danger to all the children in the home. McGlory agreed that Trish and Josh had placed the children in danger for their physical and emotional well-being based on their actions—specifically that someone harmed Tim enough for him to be fearful to go home and that Kim, a child with special needs, was not fed properly. McGlory also agreed that Tim would still be in danger of being injured by apparent cigarette burns and Kim would still be in danger of losing weight and failure to thrive if left in Trish's and Josh's care. According to McGlory, Jane and Jen would be in the same dangers as Tim and Kim, and it was in the best interest of all children to terminate the parents' rights to the children. The Department's plan was to place Tim, Jane, and Jen together long-term, and at the time of trial, the children were thriving in foster care.

McGlory agreed that nothing indicated Josh had a drug problem or a criminal record and that Josh had maintained contact with her and he had maintained employment during the lawsuit except for a short time when he was out of town. According to McGlory, although Josh had completed his service plan, he did not

10

learn as much as she would have hoped and she did not observe "a lifestyle change[]" in either Josh or Trish that is the goal of a service plan. McGlory agreed that Trish had completed her service plan except Trish failed to attend drug and alcohol meetings, and the court suspended visitation with the children because Tim was afraid. According to McGlory, Trish told her she did not use drugs, however, Trish had tested positive for marijuana at the beginning of her pregnancy with Jen. McGlory agreed that the younger children, Jane and Jen, were removed because Tim and Kim were removed, and there were no specific allegations about Jane and Jen. According to McGlory, "something was done in the household that was never explained . . . [t]hat puts every child at risk[]" and "children cannot protect themselves. So, the parent is the protector."

Testimony of Jamie Essex

Jamie Essex testified that she provides parenting classes for CPS and Trish and Josh attended her classes. According to Essex, Trish would say contradictory things or speak for Josh, and Josh was very quiet and would not always speak when called on. Essex also testified that Trish attended her anger management class where Trish spoke if called on but otherwise was quiet. Essex recalled that Trish denied having a problem and she blamed others, including CPS and Josh, for her situation. Essex agreed that Trish attended twelve parenting classes and twelve anger

11

management classes. Essex recalled that she had concerns about Trish and Josh and told the caseworkers "they needed more."

Testimony of Scherish McZeal

Scherish McZeal testified that she handled the CPS parent support group in which Trish and Josh were involved. According to McZeal, Trish signed in Josh at one meeting that Josh did not actually attend. McZeal did not believe that either Trish or Josh took responsibility for the children being in foster care. According to McZeal, although Josh attended the classes, he did not participate. McZeal testified that Trish participated but a lot of the information Trish shared "was not true information[,]" and Trish did not admit that Tim had any injuries.

Josh's Testimony

Josh testified that he was employed with a fence company when this case began but his job was eliminated during the Covid-19 pandemic, and he was now reemployed by the fence company and living with Trish. Josh agreed he completed his service plan, but he did not know "what a lifestyle change consists of." Josh testified that he wanted his children returned to him because he loves his daughters, and he stated he would do whatever the court ordered to take care of them.

<u>Trish's Testimony</u>

Trish testified that she had done everything CPS asked her to do to and whatever was required to have her children returned to her. Trish testified that she has a home with food, clothing, and bedrooms for the children and she is ready and willing to do anything for them to come home. Trish stated that she loved her children, and she said she would do anything for her children.

<u>Other Evidence</u>

An affidavit of voluntary relinquishment filed by Kim's father S.L. was admitted at trial. A report by the Court Appointed Special Advocate (CASA) was also admitted into evidence. Psychological reports on Trish and Josh, prepared by psychologist Dr. Nisha Amin, were admitted. Psycho-social assessments for Trish and Josh, prepared by Ann Williams, a licensed professional counselor, were also admitted.

The CASA report listed twelve CPS cases involving the children from May 2009 through the present case in May 2019:

> May 2009 - Neglectful Supervision - Ruled Out
> July 2010 - Medical Neglect - Ruled Out
> January 2012 - Physical and Medical Neglect
> July 2015 - Neglectful Supervision - Ruled Out
> November 2016 Neglectful Supervision - Reason to Believe; Physical Abuse - Unable to Determine; Neglectful Supervision - Ruled Out
> November 2016 - February 2017 - Family Based Safety Services
> January 2017 - Neglectful Supervision - Unable to Determine
> March 2018 - Physical Abuse - Ruled Out

13

September 2018 - November 2018 - Physical Neglect - Alternative Response

October 2018 - Physical Neglect/Medical Neglect - Alternative Response

April 2019 - Medical Neglect - Unable to Determine; Physical Abuse - Ruled Out; Physical Neglect - Ruled Out

May 2019 - Medical Neglect

All four children were placed in foster care. According to the CASA Report, Trish had stated on more than one occasion that she was not responsible for the physical abuse of Tim and she did not know how the injuries to Tim occurred. Trish also insisted "that she took good care" of Kim. The CASA indicated in the Report that since speaking with Josh at a hearing in March of 2020, she had made several attempts to contact Josh for updated information but she has not been able to "make contact" with Josh.

Dr. Amin described Trish as being extremely "other-directed" with a strong preoccupation with external approval that sometimes manifests as antagonism or resentment. Amin also described Trish as good at spotting others' weaknesses but blind to her own defects. Dr. Amin noted that Trish's criminal history includes fraud, theft, and credit card abuse. Amin listed the following diagnoses for Trish: bipolar I disorder, attention-deficit/hyperactivity disorder, mathematics disorder, cannabis and other unknown substance use disorder, and "antisocial personality disorder with narcissistic and paranoid tendencies[.]" According to Dr. Amin, Trish has "little capacity and very few resources to address problem solving/decision making for

14

herself and her children independently[]" and Trish seemed to have little understanding of or sense of responsibility for the effects of separation, neglect, and unexplained abuse on her children. Dr. Amin concluded that significant concerns impede daily functioning and her capacity to be an effective parent and suggested the children be placed with a viable caregiver.

Dr. Amin described Josh as having little insight into the requirements for raising a child or the effect of his own choices on the children. Amin characterized the relationship between Josh and Trish as one with "significant altercations and physical conflict[,] instability, emotional/mental health issues, and dysfunction[.]" According to Amin, Josh has a "limited bond with his children[]" and "limited to no understanding about discipline or structure[.]" Amin also noted that Josh reported daily use of alcohol. Dr. Amin also listed the following diagnoses for Josh: major depressive disorder, adjustment disorder with anxiety, disorder of written expression, mathematics disorder, alcohol use disorder, and unspecified personality disorder. Dr. Amin concluded that significant concerns would impede Josh's daily functioning or his capacity to be an independent and effective parent/co-parent and suggested the children be placed with a viable caregiver.

Findings of the Trial Court

The court found that it was in the best interest of Kim to terminate S.L.'s parental rights and that relinquishment was made voluntarily. The court found that

15

termination of C.H.'s parental rights was in Tim's best interest and that termination was warranted based on constructive abandonment and failure to comply with the service plan. The court found that it was in the children's best interest to terminate Trish's and Josh's parental rights and that Trish and Josh had knowingly allowed the children to remain in conditions that endangered their physical and emotional well-being and engaged in conduct or knowingly left the child with persons who engaged in conduct that endangered their physical and emotional well-being. Trish and Josh timely appealed.

Issues

In this appeal, Trish and Josh challenge the legal and factual sufficiency of the trial court's findings under subsections 161.001(b)(1)(D) and (E). They also challenge the legal and factual sufficiency of the trial court's determination that termination of their parental rights is in the children's best interest.

Trish argues that clear and convincing evidence does not support the trial court's finding that it is in the children's best interest to terminate Trish's parental rights to the children because: Tim had expressed that he missed his mother and wanted to see her; there was no testimony that Trish actually abused the children either physically or emotionally; there was no evidence that Jane or Jen suffered any physical or emotional danger caused by Trish; Trish has provided food, clothing, and shelter for the children and also made sure the children went to school; Trish

16

completed her service plan; Trish was unable to prove any lifestyle change because she was not allowed visitation with or a monitored return of the children; and Trish did not take responsibility because she "never injured her children and therefore has nothing to be accountable for." Trish challenges the court's endangerment findings arguing that: previous CPS cases involving the family ruled out abuse and neglect and did not lead to removal of the children; the evidence includes no observations of Trish knowingly placing or allowing her children to be placed in danger or any observations of the children actually being harmed; there is no evidence that Tim's caretaking of Kim was anything other than "an older sibling loving, taking care of his [] sister" and no evidence that Tim took care of Kim because Trish did not; the evidence shows no issues or concerns for Jen's health or safety, Jen was not born with drugs in her system, and she should not have been removed at birth due to "prior remote incidents[]"; Trish complied with all required drug tests, she is not prescribed any medication, and no evaluation showed any mental incapacities or conditions; and the only person Tim said injured him was his biological father, C.H.

Josh argues that there is no evidence in the record that Josh posed any "real danger" to his children in the past or future; the State's sole evidence of harm was that Tim had circular scars on Tim's back and chest, there was no proof that the children's living conditions were harmful or endangering, and "past bad acts are not sufficient to support termination of [Josh's] parental rights or to show a propensity

17

for future endangerment[]"; nothing in the record indicates a causal connection between the environment the children lived in and any resulting harm or injury to the children's emotional and physical well-being; the affidavit supporting the initial removal made no allegations against Josh, only Trish could endanger the children by not following her treatment plan, and Trish's past conduct cannot be used as a basis to terminate Josh's parental rights; there was no evidence Josh was aware that his children were in danger while he lived with Trish; and Josh completed his service plan, he maintained almost continual employment, and he nominated a relative as a potential placement for his daughters.

## Standard of Review

The decision to terminate parental rights must be supported by clear and convincing evidence, that is, "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The movant must show that the parent committed one or more predicate acts or omissions and that termination is in the child's best interest. *See* Tex. Fam. Code Ann. § 161.001(b); *see also In re J.L.*, 163 S.W.3d at 84.

In reviewing the legal sufficiency of the evidence in a parental rights termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable factfinder could have formed a firm belief

or conviction that the finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d at 266. We must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *Id.* (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id.* We give due deference to the factfinder's findings and we cannot substitute our own judgment for that of the factfinder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter when assessing the credibility and demeanor of the witnesses. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d at 86-87).

## Endangerment

Due process requires a heightened standard of review of a trial court's finding under subsections 161.001(b)(1)(D) or (E), even when another ground is sufficient

for termination, because of the potential consequences of the parent's parental rights to a different child. *See In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam). Under subsection D, parental rights may be terminated if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection E allows for termination of parental rights if clear and convincing evidence supports that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E).

Under subsection D, parental rights may be terminated based on a single act or omission by the parent. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.) (citing *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied)). Termination under subsection E requires more than a single act or omission and a "voluntary, deliberate, and conscious course of conduct by the parent is required." *Id.* at 923 (quoting *Perez v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 427, 436 (Tex. App.—El Paso 2004, no pet.)). We examine the time before the child's removal to determine whether the environment of the home posed a danger to the child's physical or emotional well-being. *Id.* at 925 (quoting *In re L.C.*, 145 S.W.3d 790, 795 (Tex. App.—Texarkana 2004, no pet.)). "'A child

20

is endangered when the environment creates a potential for danger that the parent is aware of, but disregards.'" *Id.* (quoting *In re N.B.*, No. 06-12-00007-CV, 2012 Tex. App. LEXIS 3587, at **22-23 (Tex. App.—Texarkana May 8, 2012, no pet.) (mem. op.)). The child does not have to suffer actual injury; it is sufficient that the child's well-being be jeopardized or exposed to loss or injury. *In re C.L.C.*, 119 S.W.3d 382, 392 (Tex. App.—Tyler 2003, no pet.).

Generally, subjecting a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). Abusive or violent conduct by a parent may also produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Neglect of a child's medical needs, including failure to thrive resulting from nutritional neglect, endangers a child. *See In re E.W.*, Nos. 14-19-00666-CV & 14-19-00724-CV, 2020 Tex. App. LEXIS 1232, at *23 (Tex. App.—Houston [14th Dist.] Feb. 13, 2020, pet. denied) (mem. op.); *In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.); *In re S.G.F.*, No. 14-16-00716-CV, 2017 Tex. App. LEXIS 1891, at *14 (Tex. App.—Houston [14th Dist.] Mar. 7, 2017, no pet.) (mem. op.); *see also In re J.D.G.*, 570 S.W.3d 839, 852 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *In re S.G.S.*, 130 S.W.3d 223, 238 (Tex. App.—Beaumont 2004, no pet.).

A history of repeated injuries to a child, even if unexplained, supports an inference that the child's caregivers allowed the child to remain in surroundings that endangered his physical well-being, that the parent knowingly failed to ameliorate the underlying cause, and a finding of endangerment. *See In re of J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005); *In re J.D.*, 436 S.W.3d 105, 114-115 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *C.H. v. Tex. Dep't. of Fam. & Protective Servs.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.).

Where there is evidence that a parent has endangered a child in the past, a factfinder may infer that similar conduct will reoccur in the future. *See In re L.M.N.*, No. 01-18-00413-CV, 2018 Tex. App. LEXIS 9176, at *50 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.). The factfinder may consider prior CPS history of neglect, drug use, or lack of care for the children when making a finding of endangerment. *See In re A.T.*, No. 02-17-00230-CV, 2017 Tex. App. LEXIS 10062, at *16 (Tex. App.—Fort Worth Oct. 26, 2017, no pet.) (mem. op.); *In re A.H.A.*, No. 14-12-00022-CV, 2012 Tex. App. LEXIS 3290, at **22-23 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.).

Specific danger to a child's well-being may be inferred from parental misconduct standing alone, even if the conduct is not directed at the children and they suffer no actual injury. *See In re L.W.*, No. 01-18-01025-CV, 2019 Tex. App. LEXIS 2825, at **33-34 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied)

(mem. op.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d at 738); *see also In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012) ("[E]ndangering conduct need not be directed at the child."). Courts may also consider parental conduct that did not occur in the children's presence. *In re L.W.*, 2019 Tex. App. LEXIS 2825, at *34 (citing *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Evidence of a parent's endangering conduct toward other children or family members, including evidence of domestic violence, is relevant to a determination of whether the parent engaged in behavior that endangered the child that is the subject of the suit. *See In re E.W.*, 2020 Tex. App. LEXIS 1232, at **21-22 ("Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment."); *In re L.M.N.*, 2018 Tex. App. LEXIS 9176, at **50-51 ("a parent's endangering conduct toward one child may be considered to determine whether the parent engaged in behavior that endangered other children in the home."); *In re R.W.*, 129 S.W.3d at 742 (evidence of abuse of one child is sufficient to support a finding of endangerment with respect to other children).

In addition, a pattern of drug abuse will also support a finding of conduct endangering a child even if there is no evidence that such drug use caused a physical

or actual injury to the child. *Vasquez v. Tex. Dep't of Protective & Regulatory Servs.*, 190 S.W.3d 189, 196 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). A history of illegal drug use is conduct that subjects a child to a life that is uncertain and unstable, endangering the child's physical and emotional well-being. *In re S.D.*, 980 S.W.2d 758, 763 (Tex. App.—San Antonio 1998, pet. denied); *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ); *see also In re S.R.*, 452 S.W.3d 351, 361-62 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (parent's drug use may qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being); *Walker*, 312 S.W.3d at 617 (illegal drug use may support termination under subsection E because "it exposes the child to the possibility that the parent may be impaired or imprisoned[]"). A parent's drug use, incidents of domestic violence, criminal history, and employment and housing instability prior to and during the case create a course of conduct from which the factfinder could determine the parent endangered the child's emotional and physical well-being. *See In re M.C.*, No. 09-18-00436-CV, 2019 Tex. App. LEXIS 2961, at **15-16 (Tex. App.—Beaumont Apr. 11, 2019) (mem. op.); *see also Boyd*, 727 S.W.2d at 534; *In re D.O.*, 338 S.W.3d 29, 36-37 (Tex. App.—Eastland 2011, no pet.); *In re V.V.*, 349 S.W.3d 548, 553-54 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

24

In this case, Kim, a nine-year-old child with cerebral palsy and microcephaly, weighed only twenty-nine pounds when she was removed from the home in May 2019. Kim was diagnosed with failure to thrive three times in a six-month period. CPS had received multiple complaints that school personnel had to bathe Kim because she was dirty, and she had an untreated infection at the site of her G-tube. Prior complaints included allegations that Kim had blisters and bruising on her face, pressure sores, and was underweight. Lewis testified that she observed scratching and bruising on Kim's arms that Kim could not have made to herself because she is unable to move by herself. Lewis also testified that she believed that the weight loss Kim experienced at home was life-threatening and that Kim was in immediate danger when she was diagnosed with failure to thrive.

Brister observed about a dozen circular marks on Tim's chest and back that appeared to be cigarette or cigar burns. Although both Trish and Tim had stated that the marks were scratches from a dog or mosquito bites, Brister testified that the marks resembled burns from a cigarette or cigar because the marks were "pushed in with a white circular mark which compared to [what] a cigarette would cause because a cigarette in the middle is not as hot as it is on the outside." Also, Tim initially told Brister that the marks came from "discipline" and Brister also testified that the marks on Tim were consistent with marks he saw in photos of Kim. In his interview at Garth House, Tim reported that he had been whipped with a switch and

25

that his biological father had caused some of his injuries. Lewis expressed concern that Tim was acting as a "parental child" and did most of Kim's caregiving even though Tim was only ten years old.

CPS had twelve incidents they had investigated regarding the children. While some were unsubstantiated, the reported conduct concerned claims the children were unsupervised, being neglected, and physically abused, as well as a report that Jane had a broken arm at age five months. Evidence presented at trial established that Trish had tested positive for marijuana early in her most recent pregnancy. During the pendency of this case, Josh reported to a CPS caseworker that Trish had tried to run over him and had driven away, leaving Josh lying in a ditch. CPS caseworkers observed that Trish had failed to take any responsibility for the children's problems and that she had a tendency to blame others, Trish did not admit that Tim had any injuries, and the psychologist reported that Trish does not recognize her own weaknesses or take responsibility for her children's well-being. Tim told CPS that he regarded Josh as a father figure, and Josh represented to CPS that he was the father in the home. Lewis testified that Josh participated in looking after all four children. Brister testified that there had been several CPS investigations of unexplained injuries to the children while Josh lived in the home. McZeal did not believe either Trish or Josh took responsibility for the children being in foster care.

Deferring to the trial court's credibility determinations and reviewing all the evidence in the light most favorable to the termination findings under subsections D and E, the trial court could reasonably have formed a firm belief or conviction that Trish and Josh, through their individual acts or omissions or a course of conduct, endangered the children's physical or emotional well-being. We conclude the Department established, by clear and convincing evidence, that Trish and Josh committed the predicate acts enumerated in subsections D and E. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Further, in light of the entire record, we conclude the disputed evidence the trial court could not reasonably have credited in favor of its endangerment findings is not so significant that the court could not reasonably have formed a firm belief or conviction that Trish and Josh endangered the children. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Trish's second and third issues and Josh's first and second issues addressing the endangerment findings.

### Best Interest of the Child

Trial courts have wide latitude in determining a child's best interest. *See Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982). There is a strong presumption that the best interest of a child is served by keeping the child with his or her parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Prompt and permanent

27

placement of the child in a safe environment is also presumed to be in the child's best interest. Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines nonexclusive factors to be considered in determining whether a parent is willing and able to provide a safe environment for a child. *Id.* § 263.307(b). There are several factors that may be considered when determining whether termination of parental rights is in the best interest of the child, including: (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976) (setting forth the "*Holley* factors" and noting "[t]his listing is by no means exhaustive[]"). No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest. *See M.C. v. Tex. Dep't of Family & Protective Servs.*, 300 S.W.3d 305, 311 (Tex. App.—El Paso 2009, pet. denied) ("Undisputed evidence of just one factor may be sufficient to support a finding that

28

termination is in the best interest of a child.") (citing *In re C.H.*, 89 S.W.3d at 27); *In re A.P.*, 184 S.W.3d 410, 414 (Tex. App.—Dallas 2006, no pet.).

When children are too young to express their desires, the factfinder may consider whether the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent. *In re S.R.*, 452 S.W.3d at 369 (citing *In re J.D.*, 436 S.W.3d at 118). A factfinder may consider the child's fear of a parent in making a best-interest determination. *In re E.R.*, No. 01-17-00503-CV, 2017 Tex. App. LEXIS 11163, at **31-32 (Tex. App.—Houston [1st Dist.] Nov. 30, 2017, pet. denied) (mem. op.).

Stability and permanence weigh heavily in considering a child's best interest. *See In re J.D.*, 436 S.W.3d at 119-20 (citing *In re T.D.C.*, 91 S.W.3d 865, 873 (Tex. App.—Fort Worth 2002, pet. denied)). Evidence of a recent turnaround by a parent may be considered by the factfinder but is not determinative. *See In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). A factfinder is not required to ignore a long history of harmful behaviors by a parent merely because the harmful behavior abates as trial approaches. *Id.* at 513.

A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28 (parent's past performance as parent is relevant to determination of present and future ability to provide for child); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013,

29

pet. denied) (trial court may measure parent's future conduct by past conduct); *Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.). The best-interest determination may rely on direct or circumstantial evidence, subjective factors, and the totality of the evidence. *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). If, in light of the entire record, no reasonable factfinder could form a firm belief or conviction that termination was in the children's best interest, then we must conclude that the evidence is legally insufficient to support termination. *See In re J.F.C.*, 96 S.W.3d at 266.

We have already addressed evidence of endangerment of the children by Trish and Josh, which bears on the best-interest determination. *See* Tex. Fam. Code Ann. § 263.307(b) (history of harm or abuse to a child is a factor in determining best interest); *Holley*, 544 S.W.2d at 371-72 (current and future danger to the children is a factor in determining best interest). In addition, there was evidence in this case that Kim gained about fifteen pounds after she was removed from the home. The CASA reported that all four children were doing well in their foster placements. Although Tim had stated he wanted to see his mother, he initially "begged and pleaded" not to be returned to Trish and Josh, he wanted to stay in the foster home, and he had asked his foster parents to cover the windows because he did not want his parents to find him. Although Josh had named his mother as a possible placement for his daughters,

30

Josh had moved in with his mother, and his mother lived in a two-bedroom apartment with three adults and two children, and the caseworker agreed that CPS could not place the children there "with an alleged perpetrator living in the home[.]" Kim's biological father S.L. voluntarily relinquished his parental rights, and Tim's biological father C.H. had no contact with Tim.

McGlory, a CPS caseworker for this case, testified that if the children were returned to the home, Tim would still be in danger of being burned by cigarettes, that Kim would be in danger of losing weight and failure to thrive, Jane and Jen would be in the same dangers as Tim and Kim, and it was in the best interest of the children to terminate Trish and Josh's parental rights. Essex and McZeal testified that although Trish and Josh attended parenting classes, Trish denied having a problem and blamed others, Josh did not participate much, and both Trish and Josh "needed more." At one point, Trish had signed Josh in for a meeting that Josh did not attend. Trish did not attend some of the drug and alcohol support meetings that were recommended, even though they were a service plan requirement. And, both Trish and Josh had unstable employment.

Psychologist Dr. Amin diagnosed Trish and Josh with mood and personality disorder diagnoses. Amin noted "significant concerns" about Trish's ability to be an effective parent and "highly suggested" that the children not be returned to her, given Trish's criminal and drug history, her history with CPS and allegations of abuse and

31

neglect, poor financial stability, and "her children's voiced fears of returning into her care." Dr. Amin also concluded that Josh did not appear to be able to care for his children due to emotional instability and a dysfunctional lifestyle. Counselor Ann Williams noted that Trish denied having any weakness and was angry because "Nothing is wrong[.]" Williams also noted that Josh was unable to identify any weakness in himself.

Deferring to the trial court's determination of the credibility of the testimony and other evidence, and in light of the entire record, we conclude that the evidence is legally sufficient to support the trial court's finding that terminating Trish's and Josh's rights was in the children's best interest. *See In re J.F.C.*, 96 S.W.3d at 266. We overrule Trish's first issue and Josh's third issue challenging the best interest determination.

Having overruled Appellants' issues, we affirm trial court's final order of termination.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on September 22, 2020
Opinion Delivered November 19, 2020

Before Kreger, Horton and Johnson, JJ.